UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------x

In re:

UNITED STATES OF AMERICA

   -against-                    Case No. 10 CR 600 (DLI)

STEVEN MOSKOWITZ,

      Defendant
-----------------------------------------------x

Received
In Chambers of:
U.S. District Judge
DORA L. IRIZARRY

**JUN 1 8 2014**

## MOTION TO AMEND THE FORFEITURE ORDER AND SHAREHOLDERS' CLAIM TO FORFEITED STOCK

My name is Jay Booth, and I am a shareholder in SpongeTech Delivery Systems (SPNGQ). I am not a lawyer, nor am I able to afford counsel. Under penalty of perjury, I declare that I assumed right, title, and interest to SpongeTech shares by purchasing them on the open market at various times between May of 2009, and May of 2010, approximately. My right to sell this stock has been impaired by a global trading lock placed by the Depository Trust Company (DTC). In addition, my right to hold my shares in Certificate form has also been impaired, as brokerages claim that they are unable to verify the authenticity of the shares they sold to us. I have a cash account with my brokerage, and my shares were not subject to being re-hypothecated, as they were not purchased from a margin account.

The US Attorney is requiring the defendant's assistance "...to take whatever steps are necessary to ensure that clear title..." of the forfeited stock passes to the United States. This includes undisclosed assets which may be discovered. The government's forfeiture website indicates that once clear title is obtained, the United States may then "...warrant good title to any subsequent purchaser or transferee."

1

This is exactly what shareholders want, and are legally entitled to have, especially since we *purchased* our shares. There is no reason why the United States should have a superior right to the defendant's assistance, or to obtaining clear title, or to selling these shares to subsequent purchasers. The Court is asked to compel the US Attorney to expand the determination of "clear title" to all shares of SpongeTech stock, by whatever means are necessary, to include enlisting the defendant's assistance.

## BACKGROUND

In early November 2013, I received the Electronic Blue Sheet (EBS) trading records for SpongeTech's stock from the Financial Industry Regulatory Authority (FINRA). I received these records in response to a subpoena I was authorized to issue from SpongeTech's bankruptcy court judge. A significant amount of data was provided.

The following week, the Trustee in the bankruptcy case submitted his Final Report to the bankruptcy court judge. The deadline for filing Objections to the Final Report was December 16, 2013. My objective then became to review the EBS trading records for evidence of illegal trading, prior to the deadline. I was able to do so, in my opinion. I wrote a Status Update to the bankruptcy court judge in which I said, "Finally, we have some factual documentation to examine which demonstrates significant and sustained violations of Regulation SHO in the selling activity of the Debtor's common shares." I elaborated on the trading activity of two brokerages in particular. In a Follow-Up document to the bankruptcy court, I noted that, "We are talking about thousands of such transactions during the review period."

Also in the Follow-Up, I commented on a Settlement Agreement reached between IIROC (the Canadian Regulator), and Canaccord Genuity, a Canadian clearing firm. This was specifically in regards to transactions involving SpongeTech's stock. My comments were as follows. "In addition, thanks to Canadian regulators, we know that Canaccord Genuity did not know the true identity of the beneficial owners of several nominee

accounts, nor could they account for how these shares came into possession of these account holders. This was the very issue I brought to the Court's attention two years ago."

The bankruptcy Trustee's stated intention was to conclude his administration of the bankruptcy case by December 31, 2013. That did not happen.

Rather, we see the Department of Justice (DOJ) write a Proposed Stock Forfeiture Order to this court on April 10th of this year. The Preliminary Order provides that the Attorney General or his designee "...is authorized to seize the Forfeited Stock, to conduct any proper discovery...and to commence any applicable proceeding to comply with statutes governing third party rights..."

THEN, we see the bankruptcy court judge sign an Order of Final Decree one week later, on April 17th. The time frame involving the Trustee's delay, the DOJ's Proposed Stock Forfeiture Order, and the bankruptcy court's Final Decree is noted by shareholders. It could portend good things for shareholders who, despite our best efforts, were not able to conduct "proper discovery." Shareholder information (discovery) provided to us in response to the bankruptcy court's Orders reflected a list of shareholder names from Broadridge Financial that failed to account for the number of Cede shares reported by the transfer agent. The FINRA EBS trading records were not reflective of any and all transactions either.

However, this Claim is necessary for several reasons, including the possibility that the time frame just noted may be entirely coincidental. In addition, unlike what we see in the Preliminary Order of Forfeiture, there is no language regarding proper discovery or commencing proceedings for third party rights in the Notice of Forfeiture on the government's forfeiture website.

## ADDITIONAL INFORMATION

On April 20, 2009, SpongeTech released a 10Q which claimed the cancellation of over 526 million shares of the company's stock. This would

3

have reduced the number of Outstanding Shares (OS) from 1,249,451,605 shares, to 722,866,601 shares. Moskowitz was the person who controlled the flow of shares. These shares have not been officially retired, and may still remain under Moskowitz's control.

I studied the Transfer Journals from both transfer agents. The Transfer Journal from Olde Monmouth Stock Transfer Company provides information as to how the claimed reduction in the OS could have been achieved. In July of 2012, I sent a letter to the bankruptcy court judge in which I said, "...it is my opinion that in between February 4, 2009, and April 17, 2009, the company repurchased as many as 620,175,000 shares..."

10-13647-smb Doc 389 Filed 07/11/12 Entered 07/12/12 08:13:53

Since these shares were either not returned to the Transfer Agent, or they were just not accepted by them, the shares were likely located in Cede certs #3688, and #3809, for over 198 million, and 362 million shares, respectively, prior to being transferred to WorldWide Stock Transfer Company. The development of SpongeTech's certs was discussed in my December 2011 Report of Examination, sent to the bankruptcy court judge. Upon evidence and information, it appears that these, and other certs, may be under the control of Moskowitz, intended for the announced cancellation, and not intended for the beneficial ownership of either Moskowitz nor his family members. The shares should not be forfeited to the Attorney General for condemnation, as they could represent a direct value to the company shell, which creates rights to those shares by shareholders.

The following letter to Moskowitz, from one of the company's law firms, reasonably demonstrates his intention to begin a share repurchase program. The letter was obtained by the initial Estate Representative, and was provided to her by the bankruptcy Trustee, under Court Order, in August 2011. I reviewed all the information obtained by the initial Estate Representative, under a Non-Disclosure Agreement.

4

MEMORANDUM
Steven Moskowitz, Chief Executive Officer
Spongetech Delivery Systems, Inc.
Richard Friedman, Esq.
Sichenzia Ross Friedman Ference, LLP
August 12, 2008

Repurchase of Issuer Securities

You have asked us to provide certain information regarding the requirements under applicable federal securities laws for an affiliate of an issuer to repurchase a percentage of the issuer's outstanding securities. Specifically an affiliate of the issuer ("Affiliate") or the issuer, itself "(Issuer"), may seek to purchase common stock of the company (the "Common Stock") from time to time in open market transactions.

The two methods available for an Affiliate or the Issuer to repurchase publicly-held shares through a repurchase program are: (i) a share repurchase program; and (ii) an issuer self tender offer.

pg 4061 of Trustee's documentation

---

Prior to seeing the above letter, I had already concluded that a share repurchase was commenced in August 2008. I came to this conclusion after tracking all certs issued by the company. In a synopsis I wrote to the bankruptcy judge (Doc 213) in January 2011, I noted that over 170 Cede certs were canceled in August 2008, and that they were combined into a single cert (# 2513), with over 337 million shares shown. I also expressed my opinion that, "The evidence suggests that the majority of these Cede shares are owned by the SPNG family. For example, the official reductions to the OS came from these certs."

Of interest, too, is another letter drafted by the same law firm that provided guidance in regards to the share repurchase. This was addressed to the Deutsche Borse stock exchange, and was concerning an issue regarding the company's shares being listed on the Frankfurt Exchange, without the company's consent (page 4079 of the Trustee's documentation). The letter

5

noted that, "In monitoring the trading activity of the Company's shares on the Exchange, it does not appear that your brokers are required to follow the same trading rules and procedures as are required by the U.S. Federal Securities laws and regulations on the principal markets in the United States. The Company believes that this trading activity has had a negative impact on the value of the Company's shares on the Exchange, and that it further appears to have caused a corresponding negative impact on the value of the Company's shares on the US markets."

My Report of Examination also detailed the role Penson Financial played as one of SpongeTech's predominant clearing agents.  That role was expanded when Ridge Clearing and Outsourcing, whose largest owner is Broadridge Securities Processing, converted their accounts to Penson, with whom Broadridge maintained a business relationship.  The conversion of accounts to Penson took place one month after the SEC filed their Complaint against SpongeTech.  The Depository Trust Company (DTC) provided notice of this conversion from Ridge Clearing to Penson in Release # 6914-10, dated June 24, 2010.  It reads, in part, as follows.

*"Ridge Clearing & Outsourcing Solutions, Inc. ("RCOS") will undergo a back office consolidation. As a result, effective with the close of business on June 25, 2010, RCOS will change its primary account number from 0158 to 0543 and designate 0158 and 0455 as additional accounts of Penson Financial Services, Inc.*

*Please note that effective with the opening of business on June 28, 2010, account number 0158 and 0455 will be assigned to, and all open contracts will be assumed by, Penson Financial Services, Inc., #0234."*

The relationship I just outlined, between Penson, Broadridge, and Ridge Clearing, is concerning.  I shared that concern in my Decmber 2011 Report, as follows.

*"Your Honor, I'm not saying that there is anything illegal about these relationships. I don't know whether there is, or not.  Nonetheless, considering the total volume of SpongeTech shares these firms cleared and transacted; their disciplinary Disclosures for various offenses, including*

6

*abusive shorting practices and failure to comply with reporting
requirements; and the timing of Ridge Clearing's conversion of accounts to
Penson, it is concerning to see that Ridge Clearing is, in actuality, a
subsidiary of Broadridge Financial.*

*Also concerning is the business relationship between Penson and
Broadridge. This concern is deepened by the apparent inaccuracies
supplied in the NOBO and OBO data by Broadridge, as well as by the initial
refusal by Broadridge to comply with the Court's Order to supply Ms. Levin
with the requested data, and their subsequent decision to send the data, but
only after such time as any trades conducted during the temporary lift of the
trading lock had time to settle. Does this inter-connectivity, whereby a
parent company is reporting on data that is reflective, in part, of a
subsidiary's operation, or on a business associate's operation, pose a threat
of compromise? The probability that it could is elevated, and, when viewed
in the context of this discussion, it is all the more reason to obtain additional
discovery."*

I should explain that Ms. Levin was the initial Estate Representative
appointed by the bankruptcy court judge. She was authorized, in that
capacity, to obtain certain share-related information from Broadridge, which
included the NOBO and OBO list of shareholders. I worked with her in
evaluating the data supplied by Broadridge, and we both concluded that the
number of shareholders reported was artificially low. The transfer agent and
the SEC both reported more Cede shares than Broadridge reported. I should
further explain that I became the successor Estate Representative, and that I
obtained SpongeTech's Electronic Blue Sheet (EBS) trading records from
FINRA during my service.

Please note also that I referenced a temporary lift of a global trading lock
that had been placed on SpongeTech's stock. This, too, was a DTC action,
as was their announcement of the conversion of accounts from Ridge
Clearing to Penson.

The temporary lift of the global trading lock was to allow broker/dealers to
clean up "Aged Fails." It was announced on August 5, 2011, in Release
#B0846-11. Despite whatever reason there may have been for then allowing

brokers to clear up Fails to Deliver, I outlined, in my Report, the effect this caused on our effort to get the share data from Broadridge.

*"> July 21, 2011*
*>*
*> Trustee abandons NSS claims.*


*> July 28, 2011*
*>*
*> Ms. Levin files a motion to be made Estate Representative,*
*> and a hearing is scheduled for August 16, 2011.*


*> August 5, 2011*
*>*
*> DTC announces a temporary lift of the global trading locks*
*> on 95 companies, including SpongeTech, to allow*
*> broker/dealers to clean up Aged Fails…*


*> August 15, 2011 (Day 1 of trading)*
*>*
*> From the DTC announcement, "DTC will support a program to facilitate*
*> the industry's clean up of aged fails in select globally locked securities.*
*> This notice details the information necessary for firms to*
*> participate in this program, which is scheduled to occur*
*> during the period August 15, 2011 through August 19, 2011."*

*> August 16, 2011 (Day 2 of trading)*
*>*
*> Judge grants motion appointing Susan as the Estate*
*> Representative*


*> August 17, 2011 (Day 3 of trading)*
*>*
*> SilvermanAcampora sends a Proposed Order to Judge Bernstein*

8

> which misrepresents the true nature of Susan's appointment.
> This required an extra day to submit a modified Proposed Order.


> August 19, 2011 (Day 5 and last day of trading)
>
> Susan sends requests to Broadridge, WorldWide, and
> SilvermanAcampora, to obtain the information specified in
> the modified Proposed Order.  Broadridge Security Audit
> Department responds by refusing to send the information.


> August 22, 2011 (T+1 day after trading)
>
> Broadridge reverses their position and agrees to send the
> NOBO, etc, on August 24, 2011, which is also the T+3
> settlement date.


> August 23, 2011 (T+2 days after trading)
>
> WorldWide Stock Transfer Company runs a Transaction Journal
> at the request of the Estate Representative.


> August 30, 2011
>
> The Broadridge data is received by me, seven trading days
> after the end of the trading week.


> September 2, 2011
>
> The DOJ files a motion to intervene in the civil case, and

9

*> seeks a stay on discovery, which was scheduled to be*
*> provided on Sept 9th."*

Let me address one other example of the DTC's involvement in this case. While SpongeTech was using Olde Monmouth Stock Transfer Company, it was the Transfer Agent who held the balance of the Cede shares. The day after Olde Monmouth issued Cede cert #3809, which I said earlier had over 362 million shares on it, they ceased being SpongeTech's Transfer Agent. I believe this may have been because Moskowitz attempted, at that time, to deliver those shares to the Transfer Agent for cancellation, as was announced in the 10Q. It is highly likely, based upon information to be provided, that certs could not be issued for these Cede shares, because the shares had been re-hypothecated (loaned), and were not available for issuance in Certificate form. This would have revealed a significant short position in SpongeTech's stock.

A week or so after this event, WorldWide became the Transfer Agent. When they did, custody of the Cede shares was transferred to the DTC, rather than remaining with the Transfer Agent. This was evidenced in the following email from WorldWide to the initial Estate Representative.

*"From: <ykopstick@wwstr.com>*
*Date: Mon, Oct 24, 2011 at 10:47 AM*
*Subject: Re: From Susan Hunt Levin regarding Spongetech Delivery*
*Systems, Inc*
*To: Susan Levin*

*Most transfer agents place dtc fast eligible shares as book entry. The meaning of being fast is that the transfer agent is the one holding the dtc balance. How the ta wants to hold that position is up to them.* ***When wst became agent dtc requested a draw down of the fast position into certificate form that they wanted to hold.*** *Spng was then no longer fast eligible or dwac eligible."* (Emphasis added). Custody of the Cede shares was then placed into the hands of some of the very market participants who were clearing and selling the shares in violation of Regulation SHO. I say that based on the following.

I previously disclosed that Penson Financial (including Ridge Clearing and Outsourcing) had a predominant role in clearing SpongeTech's shares. This was based upon my review of documentation, including the Stock Issuance Directions from Moskowitz to the Transfer Agent, that we obtained under Court Order from the bankruptcy trustee. I discussed this in my Report of Examination, in part as follows.

*Pg 1.  In addition, we will see that electronic issuances made to a number of individuals and companies, using various brokerages, were all networked to clear through Penson Financial Services.*

*Pp 13-14.  I went through all of the data, and selected only electronic deposits made to either Ridge Clearing and Outsourcing, or to any brokerage in which it was disclosed that Penson Financial was to serve as the clearing firm.*

*Again, Your Honor, we are only talking about electronic DWAC transactions, based upon the number of stock issuance directions in the available documentation.  However, even this incomplete history of clearing firm receipts indicates that 817,850,000 shares were delivered to stated Penson-related brokerages, as well as to Ridge Clearing...*

*Pg 14.   The WST Transaction Journal also indicates a number of trades cleared by Penson, none of which are reflected in this database, based only upon stock issuance directions sent to Olde Monmouth Transfer Company. But clearly, Penson played a significant role in bringing RME certs into the market, as well as in the trading activity which ensued... However, there are additional reasons, beyond volume, why this discussion has to start with Penson Financial and certain of its feeder brokerages.  One reason is to note the disciplinary history of some of these firms, specifically as those histories relate to naked shorting, or violations of Regulation SHO, or otherwise illegal short selling.*

Additional justification for my concern has recently been made available. Last month, the SEC issued the following Press Release announcing charges against top Penson Financial executives.

11

"SEC Announces Charges Against Four Former Officials at Clearing Firm Penson Financial Services for Regulation SHO Violations

**FOR IMMEDIATE RELEASE**
**2014-101**
*Washington D.C., May 19, 2014 —*
The Securities and Exchange Commission today announced charges against four former officials at clearing firm Penson Financial Services for their roles in Regulation SHO violations.

An SEC investigation found that ***Penson's securities lending practices intentionally and systematically violated Rule 204 under Reg. SHO.*** The SEC's Enforcement Division alleges that Penson's chief compliance officer Thomas R. Delaney II had direct knowledge that the firm's procedures for sales of customer margin securities were resulting in rule violations, yet he didn't take steps to bring Penson into compliance and instead affirmatively assisted the violations. Penson's president and CEO Charles W. Yancey ignored significant red flags about Delaney's involvement in the violations and the fact that he was concealing them from FINRA and the SEC. Penson has since filed for bankruptcy.

Two former Penson securities lending officials – Michael H. Johnson and Lindsey A. Wetzig – were charged in administrative proceedings and agreed to settle the charges. The SEC Enforcement Division will litigate the charges against Delaney and Yancey in a separate proceeding.

"This enforcement action seeks to hold Penson executives responsible for choosing profits over compliance with Reg. SHO," said Andrew J. Ceresney, director of the SEC's Enforcement Division. "We will aggressively pursue those who disregard this important rule, especially when they take affirmative steps to mislead regulators."

Daniel M. Hawke, chief of the SEC Enforcement Division's Market Abuse Unit, added, "Compliance officers are a critical line of defense against violations of the securities laws, and we rely on them to help prevent infractions from happening in the first place. Delaney, however, crossed the line when he participated in the firm's Reg. SHO violations and ***affirmatively acted to perpetuate or conceal them…***"

12

In looking at the three Administrative Proceedings associated with this SEC Press Release, additional information is provided that demonstrates that the tremendous harm caused by this example of naked shorting was not limited to the activity of four "Big Shots Gone Wild" at Penson Financial, despite what the SEC would have us think.

Take, for example, the Administrative Proceeding filed against Lindsey Alan Wetzig, of Penson's Securities Lending Department (and now of Apex Clearing, by the way).  (File # 3-15875).  The Admin Proceeding states that, "This proceeding arises out of securities lending practices at Penson Financial Services, Inc. ("Penson") that resulted in ***systematic violations*** of Rules 204T and 204 of Regulation SHO (respectively "Rule 204T" and "Rule 204").  Wetzig, acting under the direction of more senior officers in the Securities Lending Department, ***implemented procedures that he knew or should have known did not comply with Rule 204***.  In so doing, Wetzig caused Penson to violate Rules 204T(a) and 204(a) from October 2008 through November 2011."  (pg 2, Section III).  "The Commission adopted Rule 204 of Regulation SHO to address, among other things, abusive "naked" short selling and failures to deliver."  (para 3).

In the Admin Proceeding against Delaney and Yancey (File # 3-15873), we see that, "30. In December 2009, Penson's Compliance Department conducted an NASD Rule 3012 internal audit of the Rule 204T/204 close-out procedures for Buy Ins, which had been in place at Penson from October 2008 forward. The audit uncovered severe compliance deficiencies – Penson's compliance personnel sampled 113 CNS failures to deliver resulting from both long sales and short sales and found that Buy Ins' procedures resulted in Rule 204(a) violations for 112 out of the 113 securities sampled **(99% failure rate).** Delaney understood this NASD Rule 3012 audit had revealed massive and profound failures…"

The failures outlined in the Administrative Proceedings reflect that Penson did not borrow or purchase shares when they were required to do so.  They made a show of locating shares, but did not follow through with actually borrowing them.  In loaning these "air shares." Penson intentionally introduced counterfeit shares into the market at virtually every opportunity they had to execute these loans.

13

Who was providing these "locates"? The potential source for these shares should have reacted to the red flags raised by Penson's never actually borrowing the shares (or paying short interest), and constantly "dropping" the locates. If the source had 20 million shares available to loan, but Penson never borrowed the shares, those same 20 million shares would still be available to loan every time that Penson called for a locate.

In addition, Penson's clients who borrowed re-hypothecated shares, and subsequently ignored account-level recalls of these shares, also have responsibility for the CNS fails. Who were they? Did Penson continue to loan them shares, after the initial failed recall?

The fact that SpongeTech's primary clearing firm systematically introduced counterfeit shares into the market with a 99% failure rate to comply with rules to prevent naked shorting, is another reason why the Attorney General should not be granted the forfeiture of any SpongeTech stock. His effort should be focused on conducting proper discovery, and commencing proceedings regarding third party (shareholder) rights, as written in paragraph 8 of the Preliminary Order, which he must do anyway, in order to ensure "clear title," to the stock, as is required here.

However, that is not the only reason to deny the stock forfeiture. As the DOJ stated in their August 1, 2012 Motion for Protective Order (Doc 249) presented to this Court, the DOJ wanted to withhold the release of information in this case, because its dissemination, "…may negatively impact on ongoing law enforcement investigations unrelated to the conduct charged in the superseding indictment." In a footnote, the DOJ said, "We understand that material produced to the defendant by Assistant United States Attorneys or law enforcement agents from the government's firewall team is covered by a separate protective order."

If by "…the government's firewall team," this is referring to President Obama's Financial Fraud Task Force, he might want to tell his Attorney General that "you didn't build that" case against Axius. I am referring to Eric Holder's website in which he discusses the accomplishments he has achieved as Attorney General. A section of this website lists the convictions

14

he has obtained against people who committed financial fraud, including the case against Roland Kaufmann and his company, Axius, Inc. "Don't go there" would have been good advice.

Political sarcasm aside (though absolutely pertinent), this is a case which I believe illustrates why the DOJ submitted a Protective Order to bar broader circulation of information they have that is related to this case, and why they submitted the Motion to Stay Discovery, one week before it was due on September 9, 2011. It is my opinion that the Axius case is a representative example of "...ongoing law enforcement investigations unrelated to the conduct charged in the superseding indictment..." of the SpongeTech defendants, although the cases are relevant to SpongeTech.

The Axius case is related to SpongeTech by way of a Swiss stock promoter named Jean-Pierre Neuhaus. A New York Post reporter named Kaja Whitehouse identified Neuhaus as a SpongeTech investor in one of her many SpongeTech articles. Neuhaus was also charged in the Axius case, which was a sting operation.

Neuhaus, in turn, is also connected to the 1998 case of SEC vs, Cavanagh, et al. Several of the defendants in that case were also involved in SpongeTech, as early as in 2003. (This was before the final decision in the 1998 case had even been rendered, a fact which I wrote to Judge Denise Cote about last month. She heard the 1998 case, and served the SEC with a copy of the information I provided to her).

One point of this discussion is that the Axius case has an investigative history which goes back to at least1998, long before the current Attorney General was even in office.

Another point concerns the cost of under-enforcement, compared to the benefit obtained by the sacrifice. The SEC charged Kaufmann a fine of $50,000, as I recall. The Attorney General reported a fine in the neighborhood of $450,000. Yet, SpongeTech shareholders, some of the collateral damage incurred in these ongoing investigations, have suffered hundreds of millions of dollars in losses. Worse, the Executive Branch has not only failed SpongeTech investors, they have callously highlighted their accomplishments, achieved at our expense. The case just outlined, where

15

the Attorney General boasts of his Axius conviction, likely achieved in part at SpongeTech's expense, while now trying to have our stock forfeited to him, is one example. It should also be noted that the DOJ bragged about how no investors were harmed in the Axius sting operation (with the possible exception of one trade, not pertaining to Axius, but possibly a trade in SpongeTech's market).

Both the Protective Order and the Motion to Stay Discovery reflect the Attorney General's desire to withhold pertinent information from SpongeTech shareholders. Allowing the stock to be forfeited to the Attorney General could result in the condemnation of those shares, and effectively result in the destruction of evidence which should be made available to, and not hidden from, shareholders.

Even more egregious examples of reckless indifference are displayed by the SEC. These examples include relevant Litigation Releases in which the details were "intentionally omitted;" introducing a 10 day trading suspension of the company's stock, even though the company was on the Regulation SHO Threshold Securities List; and entering into a Settlement Agreement with the bankruptcy Trustee to de-register the company's stock, even though the required list of shareholders was never provided in the bankruptcy proceeding.

However, a junior compliance officer at Penson Financial asked a question which sheds a potentially much brighter light on how willfully and intentionally the SEC failed to protect SpongeTech shareholders.

In looking at the SEC's Administrative Proceeding filed against Penson's Thomas Delaney and Charles Yancey (File No. 3-15873), we see the following.

"46. On April 8, 2010, the Commission's Office of Compliance, Inspections and Examinations ("OCIE") informed Penson it had learned Penson was having problems executing close outs at market open and asked for an explanation. On April 14, 2010, a junior Penson compliance officer asked OCIE to clarify how it had learned about the potential close-out problems."

16

How, indeed? Did the Commission learn of Penson's failures as the result of their Formal Investigation of SpongeTech, which was then nearing conclusion? Did Moskowitz reveal details regarding his defensive strategy, such as in regards to the share repurchase, to combat the unabated and illegal short selling of the company's stock? This is apparent in SpongeTech's EBS trading records, which I subpoenaed from FINRA, and which reflect significant and sustained violations of Regulation SHO in the trading patterns exhibited.

One fact is clear. The month after the SEC notified Penson that it had learned of the close out problem Penson was having, they filed their Complaint against SpongeTech (May 5, 2010, CV 10-2031).

It is entirely reasonable to think that if Penson was SpongeTech's primary clearing firm, and if Penson had a 99% "…massive and profound…" Rule 204 compliance failure rate, then the SEC must have become aware of Penson's naked shorting during the course of the one full year they spent in their investigation of SpongeTech.

SpongeTech was an equity-financed company. It had just secured name-brand licenses and national retail distribution rights, and was on its way to becoming able to rely on operating income to fund its business needs. The naked shorting of counterfeit shares into its market criminally decimated the company's share price, and forced the company into bankruptcy. Those responsible, or their D&O insurance providers, represent a source of financial recovery for the company and its shareholders.

However, and actually as shareholders anticipated, the SEC waited until the bankruptcy case was closed, before issuing these Administrative Procedures against the company's largest clearing firm.

What a shame. So much pain inflicted upon the tens of thousands of SpongeTech shareholders, and the SEC does exactly what we expected. They withhold vital information from the bankruptcy judge, trustee, and shareholders, until after the bankruptcy case is closed.

17

Not only that, while the bankruptcy case was still on-going, the SEC entered into a Settlement Agreement with the bankruptcy Trustee, to have the judge approve the de-registration of the company's shares. Shareholders were left to fight that battle on our own, which we did, as reflected in Doc 287, which I submitted to the bankruptcy court in June 2011. The judge denied the Settlement Agreement, and stated in his Discussion of his ruling, that he considered the points shareholders raised in Objecting to the Settlement Agreement.

Now, though, we know that the SEC was aware of the "…massive and profound…" problem our primary clearing firm was having, in preventing Failures to Deliver in accordance with Rule 204. In addition, from the Electronic Blue Sheet trading records, we also know that regulators were aware of the significant and sustained violations of Reg SHO, apparent in the trading patterns of at least two different brokerages (both of whom FINRA cited for Reg SHO violations, without disclosing the names of the victimized companies).

The harm inflicted by the above could have resulted in substantial financial recovery, if the bankruptcy Trustee was made aware of the offenses, and if the bankruptcy judge was informed.

There is, though, another example of how Regulators circled the wagons to prevent disclosure of the truth. This concerns the evolution of Penson Financial into Apex Clearing, both of whom were registered dealers of government securities.

To recap, though, Ridge Clearing and Outsourcing had a huge role in clearing SPNGQ shares into the market. They are owned, by at least 75%, by Broadridge. The NOBO and OBO data supplied by Broadridge to the initial Estate Representative was artificially low, and reported fewer Cede shares than the Transfer Agent reported (I balanced with the number of shares the transfer agents reported). The DTC approved a conversion of Ridge Clearing's contracts to Penson Financial, with whom Broadridge had a business arrangement.

In June of 2012, Penson announced that it was leaving the clearing business in the United States. "Penson Financial is selling and transferring its

customer accounts and clearing contracts to Apex Clearing Solutions LLC...Penson Financial Services, however, will remain a fixture in the clearing business. It will receive a 94% equity interest in a new joint venture, Apex Clearing Holdings LLC, which will be managed by Apex Clearing Solutions." (articles by Bruce Kelly, investmentnews.com)

I had subpoena authority to obtain Penson's EBS trading records and, knowing that Penson had sold or transferred their clearing business to Apex Clearing, I wrote to Apex to get contact information for the subpoena, as shown.  Also shown are the replies I received from Apex.

"From: Jay Booth <jayatthelake2003@yahoo.com>
Sent: Fri May 17 18:45:27 CDT 2013
To: info@apexclearing.com <info@apexclearing.com>
Subject: Trading Records for SpongeTech Delivery Systems (SPNGQ)

May I have contact information for the person who can provide trading records, such as Electronic Blue Sheets, for transactions of SpongeTech Delivery Systems, which were cleared and otherwise transacted by Penson Financial and its affiliates and feeder brokerages?

SPNGQ is currently in bankruptcy court in New York City.  The judge in this case has appointed me as the Estate Representative, and authorized me to subpoena the trading records.

Your assistance is appreciated.
Jay P. Booth"

- jira@apexclearing.com


- jayatthelake2003@yahoo.com

Thank you for contacting APEX Clearing Corporation. We have received your inquiry and it is currently being reviewed.

19

Any follow up questions or comments should be referred to the Correspondent Support Group.

If following up by phone, please refer to case [OPS-136932] when calling.

Thank you,

Correspondent Support Group
214-765-1009
APEX Clearing Corporation

=========== Issue Details ============
ISSUE NUMBER:
OPS-136932

- jira@apexclearing.com



- 

                                                                    To

- jayatthelake2003@yahoo.com

We have closed your case [OPS-136932] based on the following resolution:

Resolution: Complete
Dear Sir:

Penson Financial Services is no longer in business and their parent company Penson Worldwide filed for bankruptcy in Jan 2013. Apex Clearing assumed the clearing contracts they had in effect as of Jun 6, 2012 but nothing more.

Case Completion Date: 2013-05-20 07:04:27.344

Please let us know if we can be of further assistance on this matter.

Thank you,

Correspondent Support Group
214-765-1009
APEX Clearing Corporation

=========== Issue Details ===========
ISSUE NUMBER:
OPS-136932

**Please note that Penson filed for bankruptcy protection just six days before my hearing was held in January 2013, in which I was requesting the Blue Sheets.**

I notified the bankruptcy judge of the above reply from Apex, when I submitted a Rule 2004 Application for FINRA's records. That Application also provided the following communication I sent to the Chicago Board of Options Exchange (CBOE). As I told the judge:

*"In an effort to determine exactly what obligations Apex had, in relation to providing Penson's Blue Sheets, I wrote to attorney Kerry Adler of the Chicago Board of Options Exchange. Attorney Adler was listed as the contact person regarding a Proposed Rule Change (File Number SR-C2-2012-018) submitted by CBOE affiliate C2 Options Exchange. The reason for the Proposed Rule Change was as follows.*

*"3 (a) Purpose*
*The Exchange proposes this rule filing to temporarily suspend the requirements of C2 Rule 3.1 and related rules regarding the approval of Permit Holders in order to immediately approve Apex Clearing as a C2 Permit Holder. The Exchange proposes this temporary suspension on an*

*__emergency basis__ to ensure that Apex Clearing can continue the clearing operations of PFSI (Penson Financial) without unnecessary __disruption, which could have a significant collateral impact__ to a number of other Permit Holders." (emphasis added).*

*My email to Attorney Adler follows.*

*__From:__ Jay Booth <jayatthelake2003@yahoo.com>*
*__To:__ "adler@cboe.com" <adler@cboe.com>*
*__Sent:__ Tuesday, July 9, 2013 5:56 PM*
*__Subject:__ SR-C2-2012- 018*

*I am writing to you in my capacity as a court-appointed shareholder Estate Representative for SpongeTech Delivery Systems (SPNGQ). The judge who granted this appointment, the Honorable Stuart M. Bernstein, sits on the bench of the Federal Bankruptcy Court for the Southern District of New York.*

*Part of the Relief the judge provided to me was the authority to subpoena the Electronic Blue Sheet (EBS) trading records of a number of market participants who effected transactions of the Debtor's common equity. Penson Financial Services had a significant role in our market, and is also the subject of the Proposed Rule Change referenced in the "Subject" line of this email.*

*It is absolutely crucial to my investigation that I examine the EBS trading records transacted by Penson. However, as a result of the conversion of Penson's accounts to Apex, it is not clear to me who is now responsible for providing that information to me.*

*Can you clarify who the responsible party is, so that I can subpoena these important records?*

*Thank you.*
*Jay Booth*

*I did not receive a reply to this email.*

*Statements of interest in regards to this emergency Proposed Rule Change include the following.*

*Pg. 6  "In addition, the Exchange reviews whether the applicant meets federal and C2 capital requirements and whether it has adopted controls and procedures to comply with Exchange rules.*

*Pg 7  As proposed this temporary suspension is contingent upon:*

*• Apex providing the Exchange with sufficient information to confirm that Apex will meet its capital requirements as a C2 Permit Holder...*

*In addition, the Exchange proposes to permit Apex Clearing to assume all existing clearing agreements and arrangements currently in effect with other C2 Permit Holders by execution of global agreements thereto.*

*Pg 8  (b) Statutory Basis*

*The Exchange believes the proposed rule change is consistent with Section 6(b)3 of the Securities Exchange Act of 1934 (the "Act"), in general, and furthers the objectives of Section 6(b)(5)4 in particular in that it is designed to promote just and equitable principles of trade, to **prevent fraudulent and manipulative acts**, to remove impediments to and to perfect the mechanism for a free and open market and a national market system and, in general, **to protect investors and the public interest**. (emphasis added).*

*Pg 10  In view of the immediate nature of the relief requested, the Exchange seeks to have the proposed amendments become operative immediately. The Exchange requests that the Commission waive the 5 business day notice of C2's intent to file this proposed rule change, as well as the 30-day delayed operative date, so that the proposed rule change may become (effective) immediately...*

*Moreover, the proposed relief does not exempt Apex from Exchange rule requirements governing Permit Holders...*

*Moreover, given the rapidity with which events have developed, C2 believes that immediate effectiveness is required in order to avoid significant disruption to PFSI's existing customers and the market generally. Time is of the essence as PFSI may be unable to continue its clearing operations beginning on June 6, 2012.*
*(http://www.C2exchange.com),*

*Events subsequent to the submission of this emergency Proposed Rule Change cast doubt on the CBOE's and C2's commitment to prevent fraudulent and manipulative acts, or to protect investors and the public interest.*

*On June 11, 2013, the SEC charged the CBOE and C2 for Regulatory Failures and cited the Exchanges for "... various systemic breakdowns in their regulatory and compliance functions as a self-regulatory organization, including a failure to enforce or even fully comprehend rules to prevent abusive short selling... An SEC investigation found that CBOE failed to adequately police and control this conflict for a member firm that later became the subject of an SEC enforcement action. **CBOE put the interests of the firm ahead of its regulatory obligations by failing to properly investigate the firm's compliance with Regulation SHO and then interfering with the SEC investigation of the firm."** (emphasis added).*

*It should be noted that the firm that allegedly engaged in this example of naked shorting has also transacted shares of the Debtor's equity."*

*http://www.sec.gov/News/PressRelease/Detail/PressRelease/136517157534 8#.Uh_ExdxtGAQ*

*I cannot say that Penson's sale of their US clearing operations and transfer of accounts to Apex was an example of diversion of assets.  I cannot say that Apex seemingly met CBOE's capital requirements by looting the Penson accounts to the point of bankruptcy.  I cannot say that the SEC should have known, based on their then on-going investigation of the CBOE, that the Proposed Rule Change submitted to them would not necessarily meet the*

24

*requirements to "prevent fraudulent and manipulative acts", or "protect investors and the public interest."* But such conclusions would be justified.

Incredible.

The SEC becomes aware of systematic Reg SHO violations at Penson as they are completing their Formal Investigation of SpongeTech in 2010. They don't disclose this until the month after SpongeTech's bankruptcy case is closed. Instead, they approve an Emergency Rule Change submitted by the CBOE and C2, to allow Apex Clearing (94% owned by Penson) to obtain Permit Holder status on an Exchange that, itself, has systemic failures to enforce Reg SHO, and whose staff has to take training classes on rules they are expected to enforce themselves, but never have, because they don't know the rules.

In August 2010, I filed a Complaint with the SEC's Inspector General. That Complaint said the following, in part.

"It is for this reason that shareholders are now asking for an audit of
> > the actual number of shares that are, and have been, in circulation.
> > We already know that the Authorized Shares are three billion. Despite
> > the communications blackout from the Company, we were at least
> > informed of those increases as they occurred. Nor do we merely want to
> > know the number of Outstanding Shares, as we have seen evidence from
> > the Company that, at least at one time, the OS may have been 15,050
> > shares less than the AS.
>
> > Since we have obvious reason to be suspect of the testimony accepted
> > by the SEC in regards to the opinion letters used to review the
> > issuance of those certs, and we have reason to believe that the
> > Transfer Agent acted improperly, and that there appears to be missing
> > certs and an unexplained imbalance in the share issuance log, we need
> > to know how many actual shares there are, and have been, in
> > circulation. And if these issues are not being addressed by the SEC
> > in their investigation, then a determination needs to be made as to
> > the validity of our assertions, and the possible negligence, or
> > collusion, of the SEC staff in failing to address these issues.
>> Thank you;
> Jay Booth"

25

I expressed a similar request to the bankruptcy judge during that same time period.

"Sir, I am asking you to deny a conversion of this case to Chapter 7, until you order the SEC to conduct a forensic audit of the number of shares that have been in circulation."

From the time management took steps to begin executing the share repurchase in February 2009, until the SEC Ordered a 10 day trading suspension of the company's stock, in October 2009, over 12 billion shares were traded, with a total average dollar value of $1.25 billion. There was a lot of money involved in the trading of SpongeTech's stock. There was a lot of financial exposure to firms like Penson, a government securities broker, whose failure, according to the Emergency Rule Change approved by the SEC, would "...***have a significant collateral impact***..." to the market, at large.

But, the fact remains that brokerages, clearing firms. SRO's, the SEC, and the DOJ have all failed in their duty to protect SpongeTech investors.

## RELIEF REQUESTED

Request that proper discovery, as specified in the Preliminary Order of Forfeiture, be conducted as required, and in light of the evidence provided herein, inclusive of a forensic audit to determine the number of shares that are, and that have been, in circulation. Further, that the Attorney General be Ordered to commence proceedings to secure third party (shareholder) rights to clear title to our shares. It is further requested that this Court, rather than the Attorney General, decides the disposition of the Forfeited Stock, and that it grants such further Relief as the Court deems proper and just.

Dated:  Rhome, Texas

June 8, 2014

/s/  Jay P. Booth
SpongeTech shareholder
195 Private Road 4436
Rhome, TX  76078
(940) 627-2128
jayatthelake2003@yahoo.com

27